# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ERIC WONG,<br><br>    *Plaintiff,*<br><br>v.<br><br>MINNESOTA DEPARTMENT<br>OF HUMAN SERVICES;<br><br>LUCINDA JESSON, in her capacity<br>as Commissioner of the Minnesota<br>Department of Human Services;<br><br>HENNEPIN COUNTY HUMAN<br>SERVICES AND PUBLIC<br>HEALTH DEPARTMENT; and<br><br>REX A. HOLZEMER, in his capacity<br>as Director of the Hennepin County<br>Human Services and Public Health Department,<br><br>    *Defendants.* | Case No. 13cv3378 DWF/JSM<br><br><br>**COMPLAINT**<br><br>**Injunctive Relief Sought**<br><br>**Jury Trial Demanded** |

Plaintiff, Eric Wong, by and through the undersigned counsel, brings this action against the Minnesota Department of Human Services ("DHS"), Lucinda Jesson in her official capacity as Commissioner of the DHS, the Hennepin County Human Services and Public Health Department ("HCHS"), and Rex A. Holzemer in his official capacity as Director of the HCHS. Plaintiff appeals an Order of the Commissioner of the DHS issued on October 30, 2013 which denied Plaintiff a "shelter needy" allowance under the Minnesota Supplemental Aid ("MSA") Act, and ad-

DEC 09 2013

ditionally brings claims arising from the same common nucleus of fact under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and 42 U.S.C. § 1983, and alleges as follows:

## INTRODUCTION

1.      This case involves arbitrary and unjustifiable discrimination on the basis of a physical handicap, namely, the rare and disabling genetic disorder known as Ehlers-Danlos syndrome, which can make it gravely dangerous for someone with the disorder to undergo physical examinations by persons who are not intimately familiar with the rare disorder and with the particularized medical needs of the persons who have this disorder.

2.      Plaintiff is currently, and has been for the past two years, receiving Supplemental Security Income ("SSI") benefits from the federal government, on the basis of his disability and his consequent inability to work.

3.      Plaintiff challenges Defendants' exclusion of Plaintiff from the full benefits of the Minnesota Supplemental Aid ("MSA") program, based on Plaintiff's inability to safely undergo a PCA ("Personal Care Assistance") services assessment without serious danger to his health and safety.

4.      By failing to carry out the requirements of federal and state law, the state and local government agencies and officials named as Defendants in this action are discriminating against and otherwise violating the rights of persons with disabilities, like Plaintiff, who would be put at serious risk of bodily harm and/or severe pain from undergoing a physical assessment by a person (or persons) who are not qualified medical professionals familiar with their rare and disabling medical conditions.

5.  This action seeks:

a.  A declaration that Defendants have violated federal law through their actions and inactions and denied Plaintiff's rights to freedom from discrimination based upon his disability and Plaintiff's rights to due process and the equal protection of the laws;

b.  An injunction prohibiting Defendants from continuing their discriminatory practices;

c.  Reversal of the October 30, 2013 Order of the Commissioner of the DHS as erroneous and contrary to law;

d.  Compensatory damages according to proof for the violations of Plaintiff's rights alleged herein; and

e.  Reasonable attorneys' fees, expenses, and costs of suit as provided by law.

## JURISDICTION AND VENUE

6.  Jurisdiction of this Court arises under 28 U.S.C. §§ 1331 and 1343(a)(3) based upon Plaintiff's federal law claims asserted in this action. This action includes federal law claims brought pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132–12133, in that the entity Defendants are public entities subject to Title II; pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 794 *et seq.*, in that the entity Defendants are recipients of federal funds; and pursuant to 42 U.S.C. § 1983, for violation of Plaintiff's federal civil rights under the color of state law. The Court may exercise supplemental jurisdiction over Plaintiff's nonfederal law cause of action, a direct appeal from the order of the Commissioner of the Minnesota Department of Human Services, pursuant to 28 U.S.C. § 1367 because the claims asserted in this action arise from a common

nucleus of operative fact. The Court has the jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57.

7.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and/or because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

8.     Plaintiff, ERIC WONG, is, and at all times relevant hereto was, a resident of the city of Minneapolis, in the State of Minnesota. Plaintiff is, and at all times relevant hereto was, a qualified individual with a disability. Mr. Wong suffers from Ehlers-Danlos syndrome, a rare and disabling genetic condition typified by joint instability and chronic musculoskeletal pain. He suffers frequent subluxations (partial dislocations) of the shoulders, elbows, hips, knees, and other joints. He is substantially limited in several major life activities, including but not limited to walking, standing, and working. Postural orthostatic hypertension, a condition related to Ehlers-Danlos syndrome, can cause him to faint while performing tasks that require him to stand upright. He experiences low nutrient absorption and has several non-overlapping medically-necessary special dietary needs. He uses a wheelchair for mobility when traveling. Plaintiff's disabling pre-existing medical conditions make him extremely susceptible to injury and pain from simple life activities. For example, the administration of Marcaine during routine dental work has caused Plaintiff to be sent to an emergency room, the administration of disinfectant swipes (such as prior to blood draws) has caused him to become ill, and a treadmill heart exam has caused him severe pain lasting for weeks. In particular, residual functional capacity examinations, *i.e.*, assessments of the limits of Plaintiff's physical abilities and his disabilities, are known to Plaintiff and his doctors to regularly cause Plaintiff severe and long-lasting pain. Thus, Plaintiff has a reasonable fear

and apprehension of bodily harm and pain from examinations and other physical interactions with persons who are not trained and/or familiar with his rare genetic disorder and other pre-existing medical conditions.

9.     Defendant, MINNESOTA DEPARTMENT OF HUMAN SERVICES ("Minnesota DHS"), is, and at all times relevant hereto was, the state agency that oversees the administration of financial supports to persons with disabilities, including the Minnesota Supplemental Aid ("MSA") program. The operations of the Minnesota DHS constitute a "program or activity" subject to the nondiscrimination requirements of the Rehabilitation Act of 1973 pursuant to 29 U.S.C. § 794(b), because the Minnesota DHS is the recipient and administrator of federal financial assistance, including but not limited to federal funds from the U.S. Department of Agriculture for the SNAP food stamp program and federal funds from the U.S. Department of Health and Human Services for Medical Assistance (Minnesota's Medicaid program).

10.     Defendant, LUCINDA JESSON, is, and at all relevant times hereto was, the Commissioner of the Minnesota DHS and is responsible for the direction, supervision, and control of that agency and the departments within and under the control of that agency. She is sued in her official capacity.

11.     Defendant, HENNEPIN COUNTY HUMAN SERVICES AND PUBLIC HEALTH DEPARTMENT ("HCHS"), is, and at all times relevant hereto was, the agency of the County of Hennepin that oversees the administration of financial supports to persons with disabilities, including the MSA program. The operations of the HCHS constitute a "program or activity" subject to the nondiscrimination requirements of the Rehabilitation Act of 1973 pursuant to 29 U.S.C. § 794(b), because the HCHS is the recipient of federal financial assistance, including but not limited to federal funds from the U.S. Department of Agriculture for the SNAP food stamp

program and federal funds from the U.S. Department of Health and Human Services for Medical Assistance (Minnesota's Medicaid program).

12.     Defendant, REX A. HOLZEMER, is, and at all times relevant hereto was, the Director of the HCHS and is responsible for the direction, supervision, and control of that agency and the departments within and under the control of that agency. He is sued in his official capacity.

## BACKGROUND

### A.     The Minnesota Supplemental Aid Program

13.     The Minnesota Supplemental Aid ("MSA") program, established by the Minnesota Supplemental Aid Act, Minn. Stat. §§ 256D.33 *et seq.*, provides cash grants to help address homelessness and poverty in Minnesota. MSA grants provide a state-funded monthly cash supplement to help people who are aged, blind, or disabled, and who receive federal Supplemental Security Income ("SSI") benefits, to meet their basic needs that are not met by SSI alone. *See* 2014–15 Biennial Budget: Human Services, at 21, State of Minnesota, Minnesota Management & Budget, Nov. 16, 2012, *available at* http://www.mmb.state.mn.us/doc/budget/narratives/ initial13/human-svcs.pdf. Because people who receive federal SSI benefits are not eligible for the state's General Assistance program ("GA"), the MSA program serves as the supplement to Minnesota recipients of the SSI program. *Id.*

14.     People who receive SSI are categorically eligible for MSA, but must apply for benefits. *Id.* The number of adults who receive SSI but do not receive MSA is increasing, and the Minnesota Department of Management and Budget has acknowledged that this fact is indicative of a systemic problem in the administration of the MSA program: "This is an indicator that people are not fully accessing the benefits they are eligible to receive. While further analysis is needed, some of

the increase may be due to small differences in policies which could be addressed through a change in MSA policy." *Id.*

**B.    The Minnesota Supplemental Aid Act Statutory Framework**

15.    The MSA program was intended by the Minnesota legislature to, among other things, "provide an integrated public assistance program for all Minnesota residents who are recipients of supplemental security income…." Minn. Stat. § 256D.34.

16.    The MSA Act defines "disability" by reference to the criteria of the Title II program of the Social Security Act. Minn. Stat. § 256D.35 Subd. 8a.

17.    For those persons receiving SSI benefits, the MSA Act determines their "income" as the gross Federal Benefit Rate, *i.e.*, the amount of SSI benefits a person is receiving.

18.    The MSA Act requires the county agency to immediately provide an application form to any person requesting Minnesota Supplemental Aid, and to determine the eligibility of an applicant with a disability within 60 days. Minn. Stat. § 256D.395.

19.    The MSA Act establishes that it is the affirmative duty of the county agency to request, and of applicants and recipients to provide and verify, "all information necessary to determine initial and continuing eligibility and assistance payment amounts." Minn. Stat. § 256D.405 Subd. 1. However, in an 1995 amendment to the MSA Act, the Minnesota Legislature provided that "[r]ecipients who maintain supplemental security income eligibility are exempt from the reporting requirements of subdivision 1…" Minn. Stat. § 256D.405 Subd. 1a. Thus, while individuals who receive both SSI and MSA "must report changes in circumstances that affect eligibility or assistance payment amounts within ten days of the change" pursuant to Minn. Stat. § 256D.405 Subd. 3, individuals who receive SSI are ex-

empt from the state and/or county-initiated verification procedures of Subdivision 1. This amendment had the effect of shielding federal SSI clients from state or county initiated re-verification of client attributes being monitored or managed by the federal Social Security Administration.

## C.   The MSA Program: Special Needs Standards of Assistance and the Shelter Needy Benefits

20.   All persons who receive SSI benefits are categorically eligible for the MSA program, but eligibility to receive a payment under the MSA program is further determined by comparing the prescribed "standards of assistance" established in Minn. Stat. § 256D.44 to an applicant's income from the federal SSI program (or otherwise). Minn. Stat. § 256D.425. Payments under the MSA program are determined as the difference between an applicant's income (through SSI or otherwise) and the relevant MSA standards of assistance. Minn. Stat. § 256D.45 Subd. 3.

21.   For new applicants who are not residents of licensed residential facilities, the base standard of assistance for the MSA program is determined by reference to whether an applicant or recipient is (a) a single person living alone, (b) a married couple living alone, (c) a single person living with others, or (d) a married couple living with others. Minn. Stat. § 256D.44 Subd. 3. This base standard is adjusted for cost of living increases in accordance with cost of living increases in the federal SSI program. *Id.* Subd. 1.

22.   The MSA Act establishes certain other standards of assistance for "special needs" above and beyond the base standard of assistance, including for medically prescribed diets, for necessary home repairs, for representative payee services, and—the relevant subject matter of this complaint—for individuals who are "shelter needy." Minn. Stat. § 256D.44 Subd. 5. The MSA Act defines a "shelter

needy" person as one who incurs monthly shelter costs that exceed 40% of gross income prior to the receipt of any MSA benefits. *Id.* (f)(3).

23.    "Shelter needy" status carries several significant benefits under the framework of the MSA Act. ***First***, a "shelter needy" person who is under age 65 and is (a) relocating from an institution, (b) eligible for the self-directed supports option under Minn. Stat. § 256B.0657 Subd. 2, or (c) receiving home and community-based waiver services and living in their own home or rented apartment, will have their standard of assistance increased by the amount of the maximum monthly SNAP (federal food stamp) allotment. Minn. Stat. 256D.44 Subd. 5(f)(1). ***Second***, a "shelter needy" MSA recipient who is eligible for the foregoing benefit is entitled to the significantly higher "living alone" base standard of assistance, regardless of whether the person actually lives alone or lives with others. Minn. Stat. § 256D.44 Subd. 2 & Subd. 5(f)(2). Together, these benefits equate to approximately $200 per month for a single individual whose benefits would otherwise be assessed under the "living with others" base standard of assistance.

24.    Eligibility for the self-directed supports option—a determining criterion for eligibility for the MSA "Shelter Needy" benefits—is determined according to Minn. Stat. § 256B.0657 Subd. 2, and requires that an individual be: (1) a recipient of Medical Assistance; (2) eligible for Personal Care Assistance ("PCA") services under Minn. Stat. § 256B.0659; (3) living in the individual's own apartment or home; (4) possessed of the ability to hire, fire, supervise, and manage service providers, and (5) not otherwise excluded or disenrolled by the commissioner of the Minnesota Department of Human Services. Minn. Stat. § 256B.0657 Subd. 2.

25.    Eligibility for PCA services—a determining criterion for eligibility for the self-directed supports option, and therefore a determining criterion for eligibility for the MSA "Shelter Needy" benefits—is determined according to Minn. Stat.

§ 256B.0659. Neither the statute nor DHS policy defines program eligibility for the PCA program. The statute instead defines certain PCA services eligible for payment, including but not limited to assistance with activities of daily living. *See* Minn. Stat § 256B.0659 Subd. 2. Eligibility for payment of PCA services is subject to an in-person assessment, including among other things, documentation of health status, determination of need, evaluation of service effectiveness, and identification of appropriate services. *Id.* Subd. 3a & 4. In-person assessments are conducted by a county public health nurse, by a certified public health nurse under contract with the county, or—if the assessment is treated as a long-term care consultation assessment under Minn. Stat. § 256B.911—by a "certified assessor" who need not have public health certification, need not be a nurse, and need not have any medical qualifications whatsoever. *Id.* Subd. 3a; § 256B.0911 Subd. 2b & 2c.

26.    Because payments under the MSA program are determined as the difference between an applicant's income (through SSI or otherwise) and the relevant MSA standards of assistance pursuant to Minn. Stat. § 256D.45 Subd. 3, the decision whether to add a "special needs" standard of assistance to the base standard of assistance may, in many cases, determine whether an applicant receives any MSA payments at all, especially for those applicants who fall into a lower "living alone" base standard.

27.    Only a small percentage of MSA recipients are able to access "special needs" benefits, and only a very small percentage of those are able to access "shelter needy" benefits. Only 2 percent of MSA recipients receive "shelter needy" benefits. Minnesota Dep't of Human Services, December 2012 Minnesota Supplemental Aid: Cases     and     Eligible     People,     at     3     (2012),     *available     at* https://edocs.dhs.state.mn.us/lfserver/Public/DHS-6143B-ENG.

## FEDERAL STATUTORY FRAMEWORK

28.    On July 26, 1990, President George H.W. Bush signed into law the Americans with Disabilities Act (the ADA), 42 U.S.C. §§ 12101 *et seq.*, establishing the most important civil rights laws for persons with disabilities in our nation's history. In enacting the ADA, Congress was specifically concerned with, among other things, the continuing discrimination against individuals with disabilities in access to public services, in the form of the failure to modify existing practices as well as the use of exclusionary qualification standards and criteria. 42 U.S.C. § 12101(a)(3) & (5).

29.    Title II of the ADA prohibits public entities, such as the state and county Defendants herein, from discriminating against the individuals with disabilities that they serve. 42 U.S.C. §§ 12131–32. The regulations promulgated under Title II specifically provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity," and that "[a] public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability … from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. §§ 35.130(b)(7) & (8). A public entity must also "administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

30.    Section 504 of the Rehabilitation Act of 1973, on which the ADA is modeled, sets forth similar protections against discrimination by recipients of federal financial assistance, such as the state and county Defendants herein. 29 U.S.C.

§§ 794 *et seq.* Each federal agency that provides federal financial assistance programs promulgates regulations that govern the conduct of entities receiving such funds, and that specifically prohibit discrimination against individuals with disabilities, including but not limited to the U.S. Department of Agriculture, 7 C.F.R. Part 15b, and the U.S. Department of Health and Human Services, 45 C.F.R. Part 84.

31.    The regulations promulgated under Section 504 of the Rehabilitation Act of 1973 specifically provide that "[n]o qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination..." and that a recipient of federal funds may not "[d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or services," or "utilize criteria or methods of administration that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap...." 7 C.F.R. § 15b.4(a), (b)(1)(i) & (b)(4); 45 C.F.R. § 84.4(a), (b)(1)(i) & (b)(4).

## FACTUAL ALLEGATIONS

32.    In late 2005, Plaintiff Eric Wong began receiving general assistance ("GA") benefits. He received a partial payment in September 2005, and a full payment of $203 in October 2005. In 2005 and 2006, Plaintiff began the process of seeking disability status and Supplemental Security Income ("SSI") from the U.S. Social Security Administration ("SSA"). Plaintiff obtained medical opinions regarding his chronic pain and hypertension. While the process of seeking SSI payments from the SSA was underway, Plaintiff continued to receive general assistance payments. Records from 2009 and 2010 show that Plaintiff was receiving $203 in GA payments and $200 from SNAP (food stamps). In the meantime, Plaintiff received several further medical assessments from doctors. Plaintiff's employability was assessed as dramatically low or nonexistent. Since then, and at all relevant times to this Com-

plaint, all medical assessments of Plaintiff have mentioned that he suffers from Ehlers-Danlos syndrome, a rare and disabling genetic condition, and have found that he has significant physical limitations in major life activities.

33.    On August 12, 2010, James Agre, M.D., a professor of Physical Medicine and Rehabilitation at the University of Minnesota Medical Center, Fairview, determined that a comprehensive functional capacity evaluation "would not provide any useful information" about Plaintiff, that such an evaluation would "expose him to severe stress," and that "[i]t would, of course, lead the patient to experience a significant flare-up of his pain for [an] ind[e]terminant length of time." Dr. Agre found that a functional capacity evaluation of Plaintiff would "of course, probably flare his pain up weeks if not months thereafter." Dr. Agre also found Plaintiff to be unemployable.

34.    In March 2011, Plaintiff was found to be eligible for, and was awarded, SSI payments from the SSA. The receipt of federal SSI payments made Plaintiff ineligible to receive state GA payments. Although Plaintiff desired to apply for Minnesota Supplemental Aid ("MSA") after being cut off from receiving state GA payments, he was not allowed to apply for MSA and was not sent a Combined Application form upon inquiry. Rather, upon inquiry, Plaintiff was instead put through a verbal screening process, which was described as an effort at paperwork reduction, wherein an HCHS case worker verbally advised Plaintiff that he was not eligible for MSA benefits because he did not live alone. In July 2011, after independently researching the MSA program, Plaintiff insisted that HCHS send him a Combined Application form, which Plaintiff received in August 2011.

35.    In August 2011, Plaintiff applied for the MSA program through the submission of a Combined Application form. Plaintiff's application was verbally denied. No written denials were ever issued. This initial denial of MSA benefits to

Plaintiff was in error. The formula for determining whether a person can receive MSA payments involves subtracting federal SSI payments from the total amount of MSA benefits that a person qualifies to receive. Because the HCHS failed to consider MSA Special Needs payments in its calculations—and failed to add either (a) the MSA "special diets" benefit, or (b) the "shelter needy" benefits (also sometimes referred to as "Housing Assistance" by state and county officials) to the MSA base standard of assistance—Plaintiff was erroneously denied benefits. Plaintiff sent multiple written appeals of this decision to the HCHS supervisors.

36.    On August 31, 2012, over one year after Plaintiff's initial submission of a Combined Application form, HCHS reconsidered its position and approved the issuance of MSA payments to Plaintiff. Under their new calculation, HCHS included the MSA "special diets" benefit that Appellant qualified to receive. However, HCHS did not include the MSA "shelter needy" benefits.

37.    Plaintiff continued to appeal the actions and inactions of the HCHS. On September 7, 2012, Plaintiff sent a notice of appeal to HCHS, asking that his MSA Special Needs benefits be recalculated to include both the "special diets" benefit and the "shelter needy" benefits. On September 26, 2012, Plaintiff separately sent a notice of appeal to HCHS, asking that he be approved for the "shelter needy" benefits (also called "Housing Assistance"). On September 26, 2012, in conjunction with Plaintiff's appeal requesting that he be approved for "shelter needy" benefits, Rita Ytzen, a supervisor for the Minnesota Public Housing Authority ("MPHA") filled out a verification form approved by the DHS confirming that Plaintiff would be eligible for enrollment and/or placement on the waiting list for publicly funded housing, if the waiting list were not closed. Ytzen mentioned to Plaintiff that neither she, nor anyone at the MPHA, had ever seen this DHS-approved form before.

Plaintiff submitted this verification form to the HCHS with his September 26, 2012 appeal.

38.     On December 1, 2012, Plaintiff received notice that his benefits under SNAP and MSA would decrease slightly because of a corresponding slight increase in his federal SSI benefits. His SNAP benefits fell from $149 to $144, and his MSA benefits fell from $200 to $196, because his federal SSI payments rose from $698 to $710.

39.     On December 26, 2012, a HCHS administrator acknowledged the possibility that Appellant was entitled to back-payments of MSA "special diets" benefits, stating, "[w]e are reviewing your case for possible MSA eligibility back to the Fall of 2011. Please have your Doctor complete the Special Diet letter confirming the DATE when each diet was approved." The letter required proof to be submitted by January 5, 2013—a period of only ten days. Despite the short time frame during the holiday season, Appellant obtained and submitted a special diet letter on January 3, 2013, completed by Dr. Jennifer Welsh, M.D., and showing that Appellant had been started on a low cholesterol diet in 2006 in response to a high-cholesterol diagnosis; started a high residue diet and then a controlled protein diet in 2008 in response to sudden weight loss; started an anti-dumping diet and then a lactose-free diet in 2009 in response to continued weight loss; started a high-calorie and organic diet in 2010 in response to an inability to gain weight after his weight loss stabilized; started a nutrient absorption diet at the recommendation of a specialist at Gillette Clinic; and finally started a gluten-free diet in 2012 in consultation with Dr. Welsh. The prescribed diets listed by Dr. Welsh were indicated as "non-overlapping," or, as containing multiple different and separate dietary components. Despite providing the requested proof letter, Appellant received no response from the HCHS regarding MSA back-pay eligibility.

- 15 -

40.     On January 15, 2013, HCHS sent Plaintiff notice that his benefits would change due to an increase in the need standard applied for the MSA determination. Plaintiff's MSA benefits rose from $196 to $296, while his SNAP benefits decreased from $144 to $99.

41.     On April 15, 2013, HCHS sent several notices to Plaintiff which had the effect of abruptly and significantly reducing Appellant's benefits. One of these notices informed Appellant that the HCHS had closed Appellant's MSA case, effective May 1, 2013. The reason given was that Appellant's gross income and expected net income were above the MSA limit, and the notice incorrectly listed Appellant's federal SSI/RSDI benefits at $1098. Another notice sent on April 15 informed Appellant that his SNAP benefits had been reduced from $99 to $16. The reason given was that his unearned income had changed from $710 to $1098—again, an incorrect statement of his federal SSI/RSDI benefits—and that his cash grant (*i.e.*, MSA benefits) had changed from $296 to $532 (despite the actual closure of his MSA case). The April 15, 2013 notices eliminated a substantial portion of Appellant's income. The loss of Plaintiff's MSA and MSA "special diets" benefits was dangerous to his physical health because of his low nutrient absorption and his inability to afford his medically-necessary special dietary needs without support.

42.     On April 24, 2013, Dr. Jennifer Welsh, M.D., issued a letter stating that she had recommended PCA services to Plaintiff, and explaining how Ehlers-Danlos syndrome and the related condition of postural orthostatic hypertension restricted Plaintiff's mobility and ability to care for himself independently. Dr. Welsh stated that her "assessment of Eric is that he requires help with bathing, shaving, dressing, meal preparation, housecleaning and transferring/help with positioning after a dislocation due to his medical conditions."

43.    Plaintiff repeatedly attempted to appeal the April 15, 2013 actions of the HCHS, and other actions and inactions of the agency, without success or even acknowledgment. On April 25, 2013, Appellant notified HCHS that he was appealing the closure of his MSA case and the reduction in his SNAP benefits. Plaintiff attached an April 22, 2013 letter from the federal SSA correcting the April 15, 2013 notices' erroneous statement of his federal SSI benefits. The letter stated that Plaintiff was receiving an SSI payment of only $710, and that he was not presently receiving RSDI payments. On May 2, 2013, Appellant sent HCHS another appeal letter, referencing his April 25, 2013 letter and asking that he be allowed to maintain his MSA and SNAP benefits at the prior levels while his appeal was pending. Upon inquiry, HCHS denied receiving Plaintiff's May 2, 2013 letter. Plaintiff received no response in writing from HCHS. Plaintiff further received no response from the supervisor assigned to his case, who had previously instructed him not to talk with other front-line workers at HCHS. Plaintiff's attempts to contact other supervisors at HCHS resulted in Plaintiff being transferred to the voicemail of the supervisor assigned to his case, who continued to be unresponsive.

44.    On July 15, 2013, Plaintiff filed an administrative appeal with the Minnesota Department of Human Services ("DHS"), challenging the inaction and non-responsiveness of HCHS, and arguing: (1) that his MSA base and "special diets" benefits should be reinstated in light of the erroneous nature of his case closure; (2) that he should be awarded back-pay of the MSA "special diets" benefits; and (3) that reasonable accommodations should be granted in determining his eligibility for MSA "shelter needy" benefits pursuant to Title II of the Americans with Disabilities Act, due to the danger to his physical health and safety that would be posed by a PCA services assessment carried out by someone unfamiliar with his rare and disabling genetic disorder and other pre-existing medical conditions. With regard to the

latter, Plaintiff argued that either an exception should be made for the PCA services assessment entirely, due to his pre-verification by the federal SSA as being dependent in activities of daily living, or that another reasonable accommodation should be made in light of his reasonable apprehension of bodily harm from a standard PCA assessment, as verified by the August 12, 2010 letter from James Agre, M.D.

45.    Plaintiff's first two arguments regarding the reinstatement of his MSA case and the back-pay of MSA "special diets" benefits were resolved prior to the administrative hearing, and were not ultimately at issue. Thus, the only issue for decision was Plaintiff's eligibility for MSA "shelter needy" benefits—specifically, whether to grant reasonable accommodations with regard to the PCA services assessment eligibility criterion. The HCHS took the position that Plaintiff met all requirements for MSA "shelter needy" benefits other than eligibility for PCA services, but that Plaintiff was not eligible for MSA "shelter needy" benefits because he had not had a PCA assessment. An administrative hearing was held on August 22, 2013 before Human Services Judge Marion F. Rucker.

46.    On October 29, 2013, the Human Services Judge issued findings of fact, conclusions of law, and a recommended order. (Attached hereto as Exhibit A.) The Human Services Judge found that Plaintiff's appeal was timely, and found that the only issue at dispute was Plaintiff's eligibility for MSA "shelter needy" benefits. However, the Human Services Judge declined to recommend any reasonable accommodations for Plaintiff's disability, concluding that "reasonable accommodations can be made, if needed, when conducting a PCA assessment." (Ex. A.) The Human Services Judge concluded that Title II of the ADA could not exempt Plaintiff from the requirement of a PCA assessment, and recommended that the Commissioner of the DHS affirm the decision of HCHS to not issue MSA "shelter needy" benefits to Plaintiff. On October 30, 2013, the Commissioner of Human Services adopted the

findings of fact, conclusions of law, and recommended order of the Human Services Judge as her final decision. (Ex. A.)

47.     At all relevant times, Plaintiff has not desired to actually receive PCA services. While Plaintiff believes and maintains that he is *eligible* to receive PCA services, and maintains that his status as a recipient of SSI, pre-verified by the federal SSA to be dependent in at least one activity of daily living, serves as definitive and sufficient evidence of such eligibility, Plaintiff does not desire to actually receive PCA services, due in part to his reasonable and substantiated fear and apprehension of bodily harm from physical interactions with individuals who are not licensed medical professionals and are not familiar with his rare and disabling genetic condition and other pre-existing medical conditions.

48.     At all relevant times, Plaintiff has refrained from voluntarily undergoing a PCA services assessment due to his well-substantiated fear and apprehension of bodily harm and/or severe pain from a physical examination by a person (or persons) who do not have experience with Plaintiff's rare and disabling pre-existing medical condition and who may not even be licensed medical practitioners. Plaintiff's doctors have recommended that he not undergo such assessments due to the risk of bodily harm and/or severe pain.

49.     At all relevant times, the only legitimate rational basis rationally related to a legitimate state interest for the PCA assessment, in the context of the MSA Act and the assessment of eligibility for MSA "housing needy" benefits, has been to verify that an applicant has a dependency in one or more activities of daily living (which is the essential eligibility criterion for PCA services). For SSI recipients like Plaintiff, whose dependency in one or more activities of daily living has been pre-verified by the federal SSA and is further documented by multiple opinions given by Plaintiff's medical doctors, this verification is redundant.

50.     Plaintiff's eligibility for the MSA program and Plaintiff's satisfaction of all criteria for MSA "shelter needy" benefits other than completing a PCA assessment are not in question, and neither is at issue. If Plaintiff did not have a disability—if he did not have Ehlers-Danlos syndrome and was not therefore at risk of serious bodily harm and/or severe, lasting pain from a PCA assessment—Plaintiff would not have been excluded from MSA "shelter needy" benefits.

51.     Despite the 1995 amendment to the MSA Act which excluded SSI recipients from county or state-initiated verification and reporting requirements related to attributes already pre-verified by the federal Social Security Administration, Minn. Stat. § 256D.405 Subd. 1a, Defendants have repeatedly and continuously asserted that Plaintiff must undergo a PCA services assessment in order to be eligible for MSA "shelter needy" benefits. Upon information and belief, Defendants have established a policy and practice of requiring MSA applicants to verify PCA eligibility, despite the redundancy of the PCA assessment for SSI disability recipients, in contravention of Minn. Stat. § 256D.405 Subd. 1a.

52.     Defendants have failed to timely provide Plaintiff with application forms upon request, in contravention of their duties under Minn. Stat. § 256D.395. Upon information and belief, Defendants have established a policy and practice of failing to immediately provide application forms upon request, in contravention of their duties under Minn. Stat. § 256D.395.

53.     Defendants have wholly failed to issue at any time certain formal, written verification requests to Plaintiff for criteria that they deem necessary to determine an individual's eligibility for the MSA "shelter needy" benefits, including but not limited to the publicly-funded housing waiting list eligibility form and eligibility for PCA services, in contravention of Defendants' duties under Minn. Stat. § 256D.405 Subd. 1 to request all necessary verifications upon receipt of an applica-

tion. Upon information and belief, Defendants have established a policy and practice of failing to issue such necessary verification requests for the determination of MSA "shelter needy" benefits, in contravention of Defendants' duties under Minn. Stat. § 256D.405 Subd. 1.

54.    Despite Plaintiff's submission of a Combined Application form for the MSA program in August 2011, Defendants have repeatedly and continuously failed to determine Plaintiff's eligibility for MSA "shelter needy" benefits and have repeatedly and continuously failed to either issue benefits or issue a written notice of denial, in contravention of the mandate of Minn. Stat. § 256D.395 that they do so within sixty days. Upon information and belief, Defendants have established a policy and practice of failing to determine the eligibility of applicants who submit a Combined Application for the MSA program for MSA "shelter needy" benefits, and failing to either issue such benefits or issue a written denial, within sixty days, in contravention of the mandate of Minn. Stat. § 256D.395.

55.    At all relevant times up until the initiation of Plaintiff's July 15, 2013 administrative appeal, Defendants have repeatedly failed to timely respond to Plaintiff's communications, letters, phone calls, and notices of appeal. Plaintiff has been left with no choice but to bring this action.

### FIRST CLAIM FOR RELIEF
#### Violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

56.    Plaintiff incorporates and realleges the above paragraphs.

57.    This claim for relief is brought against Defendant Jesson in her official capacity as Commissioner of the DHS, against Defendant Hennepin County Human Services and Public Health Department ("HCHS"), and against Defendant Holzemer in his official capacity as Director of the HCHS.

58.     Plaintiff is a qualified individual with a disability within the meaning
of Title II of the ADA and its implementing regulations, in that he is an individual
with a physical disability, meets all of the essential eligibility requirements of the
MSA program, and meets all of the essential eligibility requirements of the MSA
"housing needy" status and the corresponding benefits, except for Defendants' re-
quirement that Plaintiff undergo a PCA services assessment, *i.e.*, a physical exami-
nation by a person (or persons) who are not familiar with Plaintiff's rare and
disabling pre-existing medical condition and his individualized medical needs, and
who may not even be licensed medical practitioners, putting his health and safety at
risk.

59.     Title II of the ADA prohibits public entities from discriminating
against the individuals with disabilities that they serve. 42 U.S.C. §§ 12131–32. The
regulations promulgated under Title II specifically provide that, among other
things, "[a] public entity shall make reasonable modifications in policies, practices,
or procedures when the modifications are necessary to avoid discrimination on the
basis of disability, unless the public entity can demonstrate that making the modifi-
cations would fundamentally alter the nature of the service, program, or activity,"
and that "[a] public entity shall not impose or apply eligibility criteria that screen
out or tend to screen out an individual with a disability ... from fully and equally
enjoying any service, program, or activity, unless such criteria can be shown to be
necessary for the provision of the service, program, or activity being offered." 28
C.F.R. §§ 35.130(b)(7) & (8).

60.     The decision of the Human Services Judge, adopted by Defendants as
final, requiring a PCA assessment as a prerequisite for the provision of MSA "shel-
ter needy" benefits fails to meet the requirements of Title II of the ADA. The PCA
services assessment requirement discriminates against persons with disabilities

- 22 -

like Plaintiff, for whom this physical examination creates a risk of bodily harm and pain without reasonable modifications in policies, practices and procedures. The PCA services assessment requirement is an eligibility criterion that tends to screen out persons with disabilities like Plaintiff, and has in fact screened out Plaintiff, on the basis of his disability due to the risk of bodily harm and pain posed by the assessment. The PCA services assessment is not necessary for the provision of MSA "shelter needy" benefits, and only provides redundant information regarding Plaintiff's dependency in one or more activities of daily living, which has been pre-verified by the federal SSA for recipients of SSI like Plaintiff. Modification of the PCA services assessment requirement or of the PCA assessment procedure would not fundamentally alter the nature of the MSA program or of the MSA "shelter needy" benefits.

61.     The decision of the Human Services Judge, adopted by Defendants as final, that "reasonable accommodations can be made, if needed, when conducting a PCA assessment" fails to meet the requirements of Title II of the ADA for reasonable modifications in policies, practices and procedures because it fails to set out such modifications in advance, and thus puts the ultimate decision-making power regarding whether to make reasonable modifications of the PCA assessment procedure in the hands of the assessor, *i.e.*, the person (or persons) who do not have experience with Plaintiff's rare and disabling pre-existing medical condition and who may not even be licensed medical practitioners. This policy, practice, and/or procedure fails to mitigate the risk to bodily health and safety posed by the PCA services assessment, for the same reasons that the PCA services assessment poses a risk to Plaintiff's bodily health and safety—namely, that it puts Plaintiff's bodily health and safety in the hands of a person (or persons) who is not familiar with Plaintiff's rare and disabling genetic disorder or with his other pre-existing medical

conditions and who is therefore unqualified to determine whether modifications of policies, practices or procedures are necessary for Plaintiff's health and safety.

62.    At no time have Defendants afforded Plaintiff a reasonable accommodation for his disability or modified their policies or practices, either so that the PCA services assessment requirement could be deemed satisfied or so that the risk of bodily harm or severe pain from the assessment process could be eliminated.

63.    By requiring Plaintiff to undergo a standard PCA services assessment, and by placing the discretion to make any reasonable modifications in the hands of an unqualified person (or persons) unfamiliar with Plaintiff's rare and disabling medical condition and his individualized medical needs, Defendants have effectively denied Plaintiff reasonable modifications in policies, practices, or procedures that are necessary to avoid discrimination against Plaintiff on the basis of disability. By these actions, Defendants have effectively imposed and applied eligibility criteria that have effectively screened out Plaintiff, and have the tendency to screen out other individuals like Plaintiff whose individualized medical needs stemming from their disabilities make the PCA services assessment dangerous to their health and safety. Modification or substitution of the PCA services assessment would not fundamentally alter the nature of the PCA "shelter needy" benefits program, which is designed and intended to help disabled persons pay for shelter expenses. The standard and unaltered PCA services assessment is not, and cannot be shown to be, necessary for the provision of the MSA "shelter needy" benefits. The actions and inactions of Defendants described herein have the effect of subjecting Plaintiff to discrimination on the basis of his disability.

## SECOND CLAIM FOR RELIEF
### Violations of Section 504 of the Rehabilitation Act of 1973,
### 29 U.S.C. §§ 706 & 794

64.    Plaintiff incorporates and realleges the above paragraphs.

65.    This claim for relief is brought against all Defendants.

66.    Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 706 and 794, prohibits the exclusion of or discrimination against an otherwise qualified individual with a handicap under any program or activity receiving federal financial assistance. Defendants have received and continue to receive federal financial assistance within the meaning of the Rehabilitation Act, from federal agencies including but not limited to the U.S. Department of Agriculture and the U.S. Department of Health and Human Services.

67.    Plaintiff is a "qualified handicapped person" within the meaning of the Rehabilitation Act and its applicable regulations, in that he is an individual with a physical disability, meets all of the essential eligibility requirements of the MSA program, and meets all of the essential eligibility requirements for the MSA "shelter needy" status and the corresponding benefits, except for Defendants' requirement that Plaintiff undergo a PCA services assessment, i.e., a physical examination by a person (or persons) who are not familiar with Plaintiff's rare and disabling pre-existing medical condition and his individualized medical needs, and who may not even be licensed medical practitioners, putting his health and safety at risk..

68.    At no time have Defendants afforded Plaintiff a reasonable accommodation for his disability or modified their policies or practices, either so that the PCA services assessment requirement could be deemed satisfied or so that the risk of bodily harm or severe pain from the assessment process could be eliminated.

69.    Defendants have denied Plaintiff access to, and an opportunity to access, the MSA "shelter needy" benefits, and instead have offered Plaintiff the ability

and opportunity to access MSA "shelter needy" benefits only if Plaintiff undergoes a physical examination by a person (or persons) who are not medical doctors familiar with Plaintiff's rare and disabling genetic disorder, which presents a grave risk of serious bodily harm and/or severe pain to Plaintiff due to his disability, thereby excluding Plaintiff from participation in, denying him the benefits of, and otherwise subjecting him to discrimination, in violation of Section 504 of the Rehabilitation Act and its implementing regulations. The practices, policies, criteria and/or methods of administration employed by Defendants have the effect of subjecting Plaintiff to discrimination on the basis of his disability.

### THIRD CLAIM FOR RELIEF
**Violations of the Fourteenth Amendment of the U.S. Constitution—
Due Process, 42 U.S.C. § 1983**

70.     Plaintiff incorporates and realleges the above paragraphs.

71.     This claim for relief is brought against Defendant Jesson in her official capacity as Commissioner of the DHS, against Defendant Hennepin County Human Services and Public Health Department ("HCHS"), and against Defendant Holzemer in his official capacity as Director of the HCHS.

72.     It is Defendants' policy and practice that the "Combined Application" form, promulgated by the Minnesota Department of Human Services and utilized by the Hennepin County Human Services and Public Health Department in conjunction with an in-person or telephone interview, constitutes the full and complete application for all of the benefits of the MSA and SNAP programs, including the MSA "special needs" benefits. Under the MSA Act, Defendants had an affirmative duty to request all necessary verifications from Plaintiff, and had an affirmative duty to either issue benefits or issue a written denial within sixty days of Plaintiff's application. Minn. Stat. § 256D.395. By failing to formally request any verifications

of Plaintiff's eligibility for MSA "housing needy" benefits (such as a PCA assessment), and by failing to either issue the full benefits of the MSA program or to issue a written denial within sixty days, Defendants have acted and continue to act contrary to the requirements of the MSA Act and have denied Plaintiff the due process established by Minnesota state law and required by the U.S. Constitution.

73.     In the alternative, Defendants were prevented from formally requesting verification of Plaintiff's eligibility for MSA "housing needy" benefits (such as a PCA assessment) pursuant to Minn. Stat. § 256D.405 Subd. 1a, which is intended to exclude recipients of SSI, like Plaintiff, from state or county-initiated reverifications of information already pre-verified by the federal Social Security Administration. Nevertheless, by failing to either issue MSA "housing needy" benefits to Plaintiff or issue a written denial within sixty days of his application, Defendants have acted and continue to act contrary to the requirements of the MSA act and have denied Plaintiff the due process established by Minnesota state law and required by the U.S. Constitution.

74.     Under Minnesota state law, Plaintiff has a property interest in the full benefits of the MSA program (and other programs including SNAP). Defendants denied Plaintiff due process of law when they excluded Plaintiff from the full benefits of the MSA program (and other programs including SNAP) without adequate justification, utilizing practices and procedures that contravene the requirements of the MSA Act. The actions and inactions of Defendants had the effect of denying Plaintiff adequate notice and a meaningful opportunity to be heard.

## FOURTH CLAIM FOR RELIEF
### Violations of the Fourteenth Amendment of the U.S. Constitution— Equal Protection, 42 U.S.C. § 1983

75.     Plaintiff incorporates and realleges the above paragraphs.

76.     This claim for relief is brought against Defendant Jesson in her official capacity as Commissioner of the DHS, against Defendant Hennepin County Human Services and Public Health Department ("HCHS"), and against Defendant Holzemer in his official capacity as Director of the HCHS.

77.     Defendants do not provide individuals with disabilities who are in danger of harm from the PCA assessment process, or who are in reasonable and well-substantiated fear of harm from the PCA assessment process, with the same or even similar opportunities as other MSA recipients. Defendants have failed to provide or even identify any alternative process that would constitute a reasonable accommodation for individuals with serious disabilities like Plaintiff, and have failed to modify their policies and practices to accommodate Plaintiff as required by Title II of the ADA and by the Section 504 of the Rehabilitation Act of 1973. The exclusion of Plaintiff from the benefits of "housing needy" status under the MSA program by way of Defendants' failure to provide non-harmful alternative policies or practices is arbitrary and capricious, *i.e.*, without a rational basis, rationally related to a legitimate state interest, and therefore a denial of equal protection of the law.

## FIFTH CLAIM FOR RELIEF
### Judicial Review of State Administrative Decision, Minn. Stat. § 256.045 Subd. 7

78.     Plaintiff incorporates and realleges the above paragraphs.

79.     This claim for relief is brought against Defendant Minnesota Department of Human Services ("DHS") and Defendant Hennepin County Human Services and Public Health Department ("HCHS").

80.    For the reasons stated elsewhere in this Complaint, the decision of the Human Services Judge adopted by the Commissioner of the DHS as final on October 30, 2013, attached hereto as Exhibit A, was erroneous and contrary to federal and state law, and should be reversed.

81.    Pursuant to the requirements of Minn. Stat. § 256.045 Subd. 7, a notice of appeal was sent to Defendants within 30 days of the Commissioner's decision. The notice of appeal and a proof of service are attached hereto as Exhibit B.

82.    Because the decision of the Commissioner arises out of the same common nucleus of fact as Plaintiff's federal claims asserted in this Complaint, this Court has and should exercise supplemental jurisdiction to review the Commissioner's decision.

## ENTITY LIABILITY

83.    Plaintiff incorporates and realleges the above paragraphs.

84.    Defendant Lucinda Jesson is, and at all relevant times has been, a policy-making official for the Minnesota Department of Human Services, and as such makes policy for such entity concerning the MSA program. Defendant Jesson is, and at all relevant times has been, the official to whom final decision-making authority on all aspects of the MSA program has been delegated by policy and/or practice, by such entity.

85.    The Minnesota Department of Human Services knew of the unlawful acts of Defendant Jesson and had the power to remedy them, yet failed to do so; further, such acts ratified the acts of Defendant Jesson.

86.    Defendant Rex A. Holzemer is, and at all relevant times has been, a policy-making official for the County of Hennepin and the Hennepin County Human Services and Public Health Department, and as such makes policy for such entities concerning the MSA program. Defendant Holzemer is, and at all relevant times has

been, the official to whom final decision-making authority on all aspects of the MSA program has been delegated by policy and/or practice, by such entities.

87.     The County of Hennepin and the Hennepin County Human Services and Public Health Department knew of the unlawful acts of Defendant Holzemer and had the power to remedy them, yet failed to do so; further such entities ratified the acts of Defendant Holzemer.

## DAMAGES

88.     Plaintiff incorporates and realleges the above paragraphs.

89.     Plaintiff has suffered and continues to suffer extreme mental stress, anxiety, depression, feelings of lack of self-worth, rejection, and relegation to a second-class status due to the actions of the Defendants, and each of them. In addition, as a result of the above mental and emotional damages, Plaintiff has been physically exhausted, run down and unable to lead his life in a normal manner, and has suffered aggravation of Plaintiff's preexisting medical condition.

90.     For the violations of Plaintiff's statutory and constitutional rights, Plaintiff is entitled to an award of compensatory damages. Plaintiff is entitled to back-pay of the MSA "housing needy" benefits, which total approximately $200 per month, for the period from sixty days from the completion of his initial Combined Application to the present day. Plaintiff is further entitled to compensation for the mental, emotional, and other damages caused by the actions and inactions of Defendants.

## REQUEST FOR DECLARATORY JUDGMENT

91.     Plaintiff incorporates and realleges the above paragraphs.

92.     An actual and substantial controversy exists between Plaintiff and Defendants. Plaintiff contends that the Defendants have knowingly acted and continue

to act to deny the Plaintiff his rights under federal law, as alleged in this Complaint, among other things, by excluding Plaintiff from the receipt of benefits to which he is entitled under Minnesota statutory law in the same manner as other beneficiaries of the MSA program, by making the decision not to grant Plaintiff a reasonable accommodation or reasonable modifications of policies, practices and/or procedures for his disability, and by using procedures, criteria, and methods of adminstration lacking in due process and having the effect of excluding Plaintiff due to his disability, in total contradiction to the mandates of the MSA Act, the Rehabilitation Act and Title II of the ADA.

93.    Plaintiff requests a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 to resolve these controversies.

## REQUEST FOR INJUNCTION

94.    Plaintiff incorporates and realleges the above paragraphs.

95.    Should the Court not grant a permanent injunction, Plaintiff will suffer ongoing and irreparable injury because Defendants will continue to exclude Plaintiff from the full benefits of the MSA program, and specifically the MSA "shelter needy" benefits, based upon his disability and the consequent serious risk to his health and safety posed by the PCA services assessment process as currently constituted, and Plaintiff is without a plain, speedy, and adequate remedy, thereby rendering injunctive relief appropriate. Injunctive relief is further appropriate because money damages for Plaintiff's injuries are, in part, extremely difficult to calculate and will not fully compensate Plaintiff for the denial of Plaintiff's constitutional and statutory rights.

## JURY DEMAND

96.     Plaintiff requests a jury trial for any and all claims asserted herein for which a trial by jury is permitted by law.


**WHEREFORE**, Plaintiff respectfully requests:

    a.  That this Court enter a declaratory judgment that Defendants and each of them have violated federal law and denied Plaintiff's rights to freedom from discrimination based on his disability and Plaintiff's rights to due process and the equal protection of the laws as alleged in this Complaint;

    b.  That this Court enter a permanent injunction prohibiting Defendants and each of them from continuing their discriminatory practices; including their requirement that Plaintiff undergo the standard PCA services assessment to be eligible for MSA "shelter needy" benefits, their refusal to grant reasonable accommodations or reasonable modifications in policies, practices, and/or procedures in advance and in consultation with qualified medical professionals familiar with Plaintiff's rare and disabling genetic disorder, and their other ongoing practices which contradict the statutory requirements of the MSA Act, Title II of the ADA, and Section 504 of the Rehabilitation Act of 1973;

    c.  That this Court reverse the October 30, 2013 order of the Commissioner of the DHS as erroneous and contrary to law;

    d.  That this Court award Plaintiff compensatory damages according to proof;

e.  That the Court award Plaintiff his reasonable attorneys' fees, litigation expenses, and costs of suit pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 1988, 42 U.S.C. § 12205, or as otherwise provided by law; and

f.  That Plaintiff be granted such other and further relief as this Court may deem just and proper.

Respectfully submitted,

DATED: 12/9/13

Paul R. Hansmeier (MN Bar # 387795)
CLASS JUSTICE PLLC
100 South Fifth Street, Suite 1900
Minneapolis, MN 55402
E-mail: mail@classjustice.org
Phone: (612) 326-9801

- 33 -